MEMORANDUM OF DECISION
On November 24, 1998, the Department of Children and Families ("DCF"), filed petitions to terminate the parental rights of Tina P., mother of the above-captioned three children; James P., father of Patricia P. and Semaj P.; and Joseph A., Jr., father of Shakoya S. On December 13, 1999, trial concerning the petitions CT Page 163 occurred in this court. For the reasons stated below, the court grants the termination petitions.
FACTS
The court finds the following facts and credits the following evidence.
A. Background of the Case
Shakoya S. was born on April 2, 1992; Patricia P. on June 10, 1993; and Semaj P. on May 2, 1995. On June 25, 1995, neglect petitions were filed concerning these children, and their brother, Joseph A. III. On that date, an order of temporary custody ("OTC") was issued by the Superior Court for Juvenile Matters. At the time, the children's home contained no food and had no gas or electric service. Tina P. stated she had spent her AFDC check on drugs. At the time, Tina P. and James P. were residing with the children. Joseph A., Jr. was listed as whereabout unknown.
Subsequently, on June 30, 1995, after execution by both Tina P. and James P., the court issued Expectations concerning these parents, which specified issues to be addressed by them in order to "improve [their] chances of regaining, or keeping guardianship of [the] child[ren] permanently." Exh. 6. These expectations included: (1) keep all appointments set by or with DCF; (2) keep whereabouts known to DCF and their attorneys; (3) visit the children as often as permitted; (4) participate in drug/alcohol counseling; (5) follow recommendations; (6) sign releases as requested; (7) secure/maintain adequate housing and income; and (8) no substance abuse.
On January 31, 1996, additional court-ordered expectations were put in place for Tina P. and James P. New expectations were added and previously ordered expectations were reiterated. The parents were also to: (9) participate in counseling (parenting and individual); (10) have no further involvement with the criminal justice system; and (11) participate in domestic violence counseling, marital counseling and evaluation.
Six months later, on July 31, 1996, after a neglect adjudication, the children's custody was committed by the court to DCF. Orders of extension of the children's commitments were issued for succeeding years. As of trial, the children had been CT Page 164 in DCF's custody since the OTC, a period of over four years and five months.
At trial, where all parties were represented by counsel, Tina P. did not appear. Joseph A., Jr. and James P. appeared before the court and individually presented their written consents to the termination of their parental rights.[2] The court canvassed each father as to their consents and found that they were knowingly and voluntarily made, with the advice of competent counsel. The court accepted each consent.
B. The Mother
Tina P. was born in 1968 in New Haven, Connecticut. While in high school, she gave birth to her first child, a daughter, K. Subsequently, K. was placed in the care of a maternal aunt. Tina P. graduated from high school in 1986. Subsequent to the birth of Joseph A. III in 1988, she became addicted to cocaine. In 1991, her relationship with Joseph A., Jr. ended. Thereafter, she met her husband, James P. Intermittently, Tina P. was employed as a cashier at department stores.
In June, 1998, Tina P. gave birth to another daughter, A., who tested positive for cocaine. An OTC was issued as to this child as well. Exh. 10. From January, 1999 to June, 1999, she worked at a bank. In July, 1999, Tina P. gave birth to another son, James, Jr., who is in her care. As of December, 1999, she was unemployed. She and James P. have not been able to maintain a permanent residence. Recently, they have lived with family members and a friend at different points. James P. was incarcerated from November, 1998 to early August, 1999.
Tina P. has had no contact with Patricia, Shakoya, or Semaj since January, 1999.
C. The Children
Originally, when placed in foster care, Shakoya and Patricia were placed together; Semaj, who was not yet two months old when placed, was in a different foster home. After moving to another foster home, Patricia and Shakoya were placed in a Casey Family Services ("Casey") foster home in August, 1995; Semaj was reunited with them there a few days later. Casey is a private agency with which DCF has a contractual relationship. By the time of trial, the three sisters had been cared for in this home for CT Page 165 four years and four months.
Shakoya, who is now seven years old, is doing well in her foster home. She receives therapy to help her with her behavioral issues and emotional trauma from past family situations. She is bonded to her foster mother. At visits with her birth family, she was openly defiant. According to a psychological evaluation, dated March 2, 1998, prepared by Dr. Bruce Freedman, Shakoya stated she had never lived with Tina P., but loved her. Exh. 3 at 10. At the time of the evaluation, she had not seen her mother in "quite a while." Dr. Freedman described an observed interaction between Tina P. and the children, where her behavior was generally appropriate. Id. at 11.
Shakoya is a very bright and high functioning child. Her school behavior has improved, though it still presents problems. Exh. 9 at 3. She refers to her foster mother as "Mommy". Id. Her guardian ad litem (G.A.L.) reported a "bonded and adjusted relationship" between her and her foster mother. Id.
Patricia has reached age six. She, too receives therapy. She is a happy, active and outgoing child. She was observed to be having some level of academic difficulty, which, according to the foster mother, will be addressed by classroom intervention. Exh. 9 at 2. She views her foster mother as her mother. Her G.A.L. reported that she has "great ability and insight." Id.
Semaj, now age four, was born with a high level of cocaine in her system. She is very bright and active. Id. She is closely bonded to her foster mother, who has cared for her for almost her entire life. She became more and more aggressive during birth family visits. She became angry when her birth mother said she was her mother. Exh. 1 at 21-22. She had no parent-child relationship with either parent even when visits occurred. She did not appear to recognize her biological mother as her mother. She refers to her biological mother as "the fake mother." Exh. 2 at 2.
All of the children have enjoyed the love, care and concern of what has been, for a long time in their lives, a familiar foster setting. They appear to be thriving there, and are intimately attached to each other and their foster mother. Exh. 9 at 2.
The children's foster mother, Sonia, is apparently a model foster mother. The children live with her in a house in a CT Page 166 residential neighborhood. She is employed as a psychiatric nurse. She cares for them, takes them to medical visits, attends to their progress at school and takes them with her when she travels. Recently, she received an award from Casey as a foster mother.
Mr. Coles, the DCF social worker who testified at trial, spoke highly of the positive interaction between the children and their foster mother. She would like to adopt all three children if they are legally available.
D. Efforts Toward Rehabilitation and Reunification
Tina P. has struggled to deal with her drug addiction. DCF referred her to the APT Foundation ("APT") for substance abuse evaluations and treatment. Effective October 1, 1997, she was discharged from the APT Central Treatment Unit for failure to attend. Exh. 5. She had been admitted in February, 1997; she provided 19 clean drug screens. However, she would not regularly participate in group meetings. When she left she had not picked up a letter, which was written at her request, verifying the clean drug screens. According to APT, she had "much work to do in treatment. . . ." Id.
DCF referred her also to Amethyst House, Mothers Project, Gaylord Hospital, MAAS, South Central Rehabilitation Program, Hill Health Center/Grant Street Partnership for in and outpatient substance abuse treatment. Exh. 1 at 12. She did not successfully avail herself of these services.
In July, 1995, she was admitted to Gaylord for substance abuse treatment. After discharge in August, 1995, she failed to return to the Women's Center for support. In September, 1995, she went to counseling at Northside Community Outpatient Services, and participated in individual, group, and family therapy. After starting to use drugs again, she stopped attending Northside in January, 1996.
After being given new court-expectations on January 31, 1996, Tina P. became whereabouts unknown to DCF until June 13, 1996. Exh. 1 at 17. She was again referred for drug screening and counseling without success. Id.
In October, 1996, she tested positive for drugs again. Id. at 18. In November, 1996, she began parent skills training classes, CT Page 167 but did not progress. Id. In 1997, she was again referred to and began drug treatment, again unsuccessfully. Id. She began using drugs again in November, 1997. Id.
In April, 1998, a service agreement was signed, containing expectations which were similar to those twice previously ordered by the court. Id. at 19. Added was the requirement that Tina P. was to comply with the children's therapeutic treatment. She did not comply. Id.
In addition, other services were offered by the Visiting Nurse Association, Family Support Services (counseling), and New Haven Family Alliance (parenting classes).
VISITATION
As to visitation, the parents were provided with supervised visits by Casey. The foster mother permitted visits at her home. Tina P. called these off. In 1997, weekly visits were scheduled every Thursday at Casey's office in Bridgeport. Tina P. attended one-half of the scheduled visits. Some involved failures to appear with no excuses. Casey provided train fare, and DCF provided bus fare for Tina P. and James P. to visit. Automobile transportation was offered at other times.
According to Exh. 7(e), an October 22, 1997 letter from Casey, Tina P. did not attend administrative case reviews for the children on October 17, 1997 and October 21, 1997. Following a Case Status Conference held on March 17, 1998, which occurred two weeks after Dr. Freedman's March 2, 1998 evaluation, a reunification plan was implemented for the purpose of returning the three girls to Tina P. and James P. by September 30, 1998. Exh. 1 at 4.
In-home visits at the Parker's residence were held. Between March and June, 1998, four visits occurred. The parents' willingness to have these visits was sporadic; half the time they were unavailable. Casey attempted to address Tina P.'s inability to be a parent. Dr. Newell of Casey attempted to assist Tina P. in the supervision of her children. Her parenting skills did not progress.
According to Mr. Coles, the visits were suspended in June, 1998. Tina P. said she found the visits too tiring and a strain on her. She was pregnant at the time; her daughter, A., tested CT Page 168 positive for cocaine at birth. Exh. 10. According to Tina P., she had begun using cocaine again one month before the child's birth. Exh. 1 at 13. Mr. Coles sent a letter to Tina P., Exh. 7(a), which reflected Tina P.'s statement to him that the visits were "overwhelming." He noted also that Tina P. acknowledged that, if the drug screening she submitted to on May 13, 1998 "tested as far back as six months, she would test positive." Id.
After Tina P.'s failure to have scheduled visits on May 28, June 4, and June 11, 1998, Casey sent a letter expressing its concern Exh. 7(b).[3] The letter noted that, "[t]he children are questioning where their mother is and we need to address their questions with appropriate answers and work collaboratively to structure the development of a permanent plan." Id. Due to Tina P.'s inability to cope with her children, visits were suspended. Exh. 7(a). She could not develop parental relationships with the children. Exh. 1 at 22.
In July, 1998, Tina P. admitted using cocaine since November, 1997. Exh. 1 at 20. She entered Amethyst House, an inpatient program, but left in the same month. Court-ordered expectations were entered again on August 24, 1998, containing provisions similar to those previously directed. At the time of the filing of the termination petition, November, 1998, she had returned to APT for treatment.
Later in 1998, Mr. Coles of DCF and Tina P. entered into a Service Agreement, dated December 7, 1998, concerning conditions for re-establishing visitation. Exh. 4. These included: keep whereabouts known to DCF, no drug involvement, supervised visitation appointments to be set by DCF, visitation appointments were to be kept or visits would be terminated. Id. Tina P. could not meet the expectations. Again, Tina P. has made no effort to contact her daughters since January, 1999. She contacts Joseph occasionally. Exh. 2 at 2.
While she completed a twelve step program in 1999, she refused to go to aftercare which had been recommended by the Central Treatment Unit. After the birth of A. in 1998, Tina P. and her husband lived in five separate locations and failed to notify DCF where they were. As of trial, she had neither employment nor stable housing. Exh. 2 at 2.
ADJUDICATION
CT Page 169
A. Reunification
In order to terminate parental rights, DCF must initially show, by clear and convincing evidence, that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Gen. Gen. Stat. § 17a-112(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The statute does not define the term "reasonable." Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2d Ed.). State v. Antrim, 185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807,812-813 (1999) (citations omitted); In re Jessica B.,50 Conn. App. 554, 566 (1998).
Based on the evidence presented at trial, this court finds, by clear and convincing evidence, (1) that DCF made reasonable efforts to reunify the children with Tina P. and (2) that she is unable or unwilling to benefit from such efforts. After the 1995 OTC, DCF provided casework, service referrals, and visitation, as well as a program of planned reunification with a target date. Referrals were made, among others, for substance abuse screening and treatment, individual and family counseling, and parenting classes. While some progress was intermittently made, the prospects for reunification fell apart in the spring and summer of 1998. This coincided with Tina P.'s resumption of drug use and her pregnancy, which resulted in another OTC for another child. She, herself, found visiting with her own children "overwhelming." The thread was never picked up again.
Without doubt, DCF made reasonable efforts to reunify Tina P. with her daughters. Her conduct showed that she was unable or unwilling to benefit from these efforts, which became inappropriate.
B. Statutory Grounds
CT Page 170
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112(c)(3).
DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship as to Tina P. The court finds that DCF has proven each ground by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M.,6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
Based on the foregoing discussion, the evidence of abandonment is clear and convincing. As of the end of visitation in June, 1998, Tina P. abandoned her daughters. Her drug addiction was a greater priority for her than reunification. She had no contact with them at all after January, 1999. She also did not keep in contact with DCF after June, 1998, even to keep up to date as to her daughters' conditions. She abandoned the children to be cared for by DCF and their foster mother.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering CT Page 171 the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). The court previously has found the children have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In Hector L.,53 Conn. App. 359, 366-67 (1999). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is appropriate for the court to consider not only Tina P.'s conduct before the filing of the termination petition, but also her conduct occurring after it. Here, over one year elapsed between the filing of the termination petition in November 1998 and the trial in December 1999, which is a reasonable time, especially given the ages of the children.
As the Appellate Court recently noted In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the question is whether Tina P. was better able to be a parent to the children when the petition was filed that at the time of their commitment. See In re Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed in November, 1998, three years and five months after the neglect adjudication in June, 1995.
Based on the foregoing discussion of the fact's, the evidence is clear and convincing that Tina P. is not able to be a parent to any of the three children and that she could not become able to do so within a reasonable time.
In accordance with the court-ordered Expectations, DCF made appropriate referrals, particularly for substance abuse treatment, counseling, and parenting classes. Casey provided assistance in parenting skills. Substance abuse is the dominant theme in this case. Tina P. returned to using drugs and lost the opportunity to be a parent to these young people. Tina P. also CT Page 172 could neither remain employed nor secure stable housing. More recently, she has been drug free. But, she has not followed through with aftercare. It is obvious that the strong potential for resumed drug abuse is present.
Meanwhile, during all this time, and especially since June, 1998, when reunification failed, the children have been cared for by their foster mother. Their half-sibling, A., unfortunately was the subject of an OTC three years after they were. It is noteworthy also that Tina P.'s parenting skills did not progress.
As stated above, the key is the ability to be a parent to these children, Shakoya, Patricia, and Semaj. Fortunately, they are part of the same foster family, with the same foster mother, to whom they are each bonded.
Despite her initial efforts at trying to address some of the issues that led to the children's removal, Tina P. has demonstrated that she has not been rehabilitated. She cannot assume a responsible position in any of the three children's lives now. She was given a more than reasonable opportunity to establish and maintain a relationship with each child. There is no reason to believe that she would be able to assume a responsible position in any of their lives in the future.
3. No On-Going Relationship
DCF also alleges that there is no ongoing parent-child relationship between the children and Tina P. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat § 17a-112(c)(3)(D); In re SavannaM., 55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645
(1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently CT Page 173 noted, "the feelings of the child are of paramount importance."In re Tabitha T., 51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Here, based on the foregoing discussion, there is no doubt that the required relationship between Tina P. and each child is absent. Understandably, Semaj has never recognized Tina P. as her mother, since she has been out of her custody since June 1995, only a few weeks after she was born. Like her, Shakoya and Patricia are bonded to their foster mother, who has met their needs for a substantial period of time. They recognize that they have had no visits with or contact with their biological mother for a long time.
Clearly and convincingly, there is no relationship between the children and Tina P.
In deciding whether it would be in the children's best interests to permit further time for relationship with Tina P. to develop, the court may consider several factors. In re SavannaM., 55 Conn. App. at 816. In view of the extensive stay the children have had with their foster mother, their bonded relationship with her, the total dearth of contact they have had with their biological mother, and the lack of any relationship between them and her, it is clearly not in their best interests to permit additional time to pass in foster care in order to allow their mother to attempt to establish a relationship with them. It is also evident that she has no real interest in doing so.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124, 131 (1997). Time is of the essence in custody cases. In re Alexander V.,25 Conn. App. 741, 748 (1992). Four years and five months in foster care CT Page 174 is a long time in the lives of Shakoya, Patricia, and Semaj. Based on the foregoing findings and discussion, the court finds, by clear and convincing evidence, that termination of Tina P.'s parental rights is in their best interests. They need and are entitled to permanency and stability, in order to continue to properly develop. As their G.A.L. noted, the children "have a sense of identity and security for the first time in their life." Exh. 9 at 3. If Tina P.'s parental rights were allowed to continue and if the children's familial attachment to their foster mother was disrupted, it could cause significant emotional damage to them. They are also fortunate to be with one another. To permit disruption of this family unit would be ignoring them as people, as well as the relationships established with their foster mother. Added to these factors is the evidence that, as a result of drug addiction, yet another child was removed from their mother's care. The evidence is clear and convincing that Tina P.'s parental rights must come to an end.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(d). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for each child and timely offered Tina P. services and visitation. These services were relevant to her needs.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation and made reasonable efforts to reunite the children with their mother, but that there was no reasonable possibility of reunification as a result of her failure to utilize services and subsequent abandonment of her children.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations CT Page 175 under such order.
On June 30, 1995, at the time of the neglect adjudication, Tine P. signed and the court entered Expectations. Exh. 6. These were listed earlier in this Memorandum of Decision, at 2. On January 31, 1996 and August 24, 1998, other court-ordered expectations were entered, as discussed supra, at 2, 8. As discussed, DCF provided appropriate referrals and opportunities for visitation.
The court finds the following as to compliance with the terms of the Expectations. Although, initially, Tina P. made sporadic efforts to keep appointments and keep her whereabouts known, she stopped doing so in the summer of 1998. At that point, she also failed to visit the children. While she sporadically participated in drug counseling, she did not follow service providers' recommendations and engaged in substance abuse. She could not maintain adequate housing and income. She did not complete counseling. She apparently had no involvement with the criminal justice system.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
After June 1998, the children's relationship with their parents became non-existent. At this point, their emotional ties are to their foster mother, to whom they are securely attached and bonded.
5) The age of the children.
Shakoya is age seven; Patricia is age six; and Semaj is age four. For many years, our Supreme Court has noted the deleterious effect of prolonged temporary care of neglected children. In reJuvenile Appeal (83-CD), 189 Conn. 276, 292 (1983). It is not in the children's best interests that they remain in a legally temporary foster home. They are entitled to the legal permanency afforded by a termination.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained CT Page 176 contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitation, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that Tina P. has not made reasonable efforts to adjust her circumstances or conditions to make it in the children's best interests to return to her in the foreseeable future. Effective in June, 1998, she abandoned them. She did not make meaningful efforts to maintain contact with them or DCF. The opportunity to develop and maintain significant relationships with the children was lost.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Tina P. did not face unreasonable interference of James P., or Joseph A., Jr., from any third persons, or from economic circumstances. Her predicament is a consequence of her own actions and her failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Patricia P., Shakoya S. and Semaj P. for terminations of parental rights to enter with respect to the mother, Tina P., and the fathers James P. and Joseph A., Jr. Accordingly, the court hereby grants the petitions to terminate the parental rights of Tina P., James P., and Joseph A. Jr.
The court further orders that the Commissioner of DCF is appointed statutory parent for Patricia P., Shakoya S. and Semaj P., for the purpose of securing an adoptive family. If the foster mother is willing to adopt, it is the court's direction that she receive first consideration to adopt each child. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered. CT Page 177
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT